823 F.2d 1341
 126 L.R.R.M. (BNA) 2025, 56 USLW 2109,
107 Lab.Cas. P 10,113,
8 Employee Benefits Ca 2249
 Thomas FUJIKAWA, in his capacity as a union trustee on the
PECA-IBEW Vacation & Holiday, Supplementary
Unemployment Benefit, and Annuity Funds,
Plaintiff-Appellant,
v.
John GUSHIKEN, Rodney Kim, and Nick Teves, Jr., in their
respective capacities as employer trustees on the PECA-IBEW
Vacation & Holiday, Supplementary Unemployment Benefit, and
Annuity Funds, Defendants-Appellees.
 No. 85-1694.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 5, 1986.
Decided July 30, 1987.
 
 Thomas P. Gill, Arlette S. Harada, Gill Park Park & Kim, Honolulu, Hawaii, for plaintiff-appellant.
 Jeffrey S. Harris, Honolulu, Hawaii, for defendants-appellees.
 Appeal from the United States District Court for the District of Hawaii.
 Before NELSON, REINHARDT and WIGGINS, Circuit Judges.
 REINHARDT, Circuit Judge:
 
 
 1
 Thomas Fujikawa, a trustee of several multiemployer trust funds established by the Pacific Electrical Contractors Association (PECA) and the International Brotherhood of Electrical Workers (IBEW) pursuant to section 302(c) of the Labor Management Relations Act (LMRA), 29 U.S.C. Sec. 186(c), brought suit against three of his co-trustees, John Gushiken, Rodney Kim, and Nick Teves, for alleged breach of their fiduciary duties under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. Sec. 1001 et seq. As required by LMRA, there are equal numbers of employer-trustees and union-trustees for the various funds. The defendants, all employer trustees, filed a motion for summary judgment arguing that the district court did not have jurisdiction over the case because Fujikawa, a union trustee, had failed to exhaust internal administrative remedies as required by the trust agreement and LMRA section 302(c)(5), 29 U.S.C. Sec. 186(c)(5). The district judge agreed and granted the motion. Fujikawa appeals; he asks us to reverse the order in favor of the employer trustees and to grant his cross-motion for summary judgment instead.
 
 I. Facts
 
 2
 This dispute arises out of the refusal of employer trustees to authorize the payment of trust fund benefits to workers engaged in an industry-wide strike. Prior to the strike, the practice of the Funds had been to pay benefits by checks: (1) co-signed manually by one Union Trustee and one Employer Trustee for benefits from the supplemental unemployment fund and the training and vacation fund; (2) authorized by computerized signatures for health and welfare benefits and for relatively insignificant supplemental unemployment benefits (under $500); and (3) approved by the Trustees and disbursed by the custodian bank directly for annuity and pension benefits.
 
 
 3
 Shortly after the strike began, Rodney Kim, who is also the Executive Secretary of the multiemployer association (PECA), wrote a letter to the PECA-IBEW Fund Administrative Office stating:
 
 
 4
 [B]efore any trust fund benefits are paid ... a meeting of the trustees of each fund [will] be held. The purpose of these meetings is to determine what benefits should be paid during the strike. For instance, no benefits for vacation/holiday and supplemental unemployment should be paid from and after September 10, 1984 without prior trustee approval. Therefore, I am returning [the supplemental unemployment benefits] checks unsigned, pending a meeting of the trustees. Also, do not use any printed signature of PECA trustees for checks, from and after September 10, 1984.
 
 
 5
 The Administrator of the Funds, Tetsuro Ushijima, replied to Kim stating that he would abide by Kim's instruction. However, Ushijima noted:
 
 
 6
 As an Employer Trustee of each PECA-IBEW Trust Fund, ... you can appreciate the predicament that the Ad Office is placed in as a result of the labor dispute between PECA and Local Union 1186 IBEW ... [T]he Trustees of each Fund and I as Administrator ... have a primary duty and fiduciary responsibility to continue providing benefits to eligible participants of each Plan in accordance with the Plan rules.
 
 
 7
 After the strike commenced, two of the employer trustees, Kim and Gushiken refused to sign benefit checks. Teves, the other employer trustee, informed the Administrative Office that, because of the strike, no loan applications to the Annuity Fund based on financial hardship would be approved.
 
 
 8
 After almost four months, the strike was settled and a new collective bargaining agreement was ratified. At that time, the employer trustees resumed signing benefit checks, at least for most of the participants and beneficiaries--those who had purportedly waived the right to sue the trustees for failure to pay benefits during the strike.
 
 
 9
 While the strike was still in progress, Fujikawa, in his capacity as union trustee, brought suit in federal district court alleging that the employer trustees had breached their fiduciary obligations to the funds and their concomitant duty to act solely in the best interests of the funds' beneficiaries. See 29 U.S.C. Secs. 1103(c)(1) & 1104. Fujikawa contended that the employer trustees refused to sign or approve the checks in order to deny monetary benefits to workers who exercised their right to strike, and that their refusal had the effect of strengthening PECA's bargaining position in its negotiations with the union.
 
 
 10
 The employer trustees filed a motion for summary judgment arguing that Fujikawa, a union trustee, was required to exhaust internal administrative procedures before filing suit. Fujikawa filed a cross-motion for summary judgment.
 
 
 11
 The district court granted the employer trustees' motion. The court construed our decisions in Amato v. Bernard, 618 F.2d 559 (9th Cir.1980) and Amaro v. Continental Can Co., 724 F.2d 747 (9th Cir.1984) as requiring Fujikawa to exhaust internal claims procedures. The court also interpreted a provision in the trust agreement requiring beneficiaries to exhaust administrative remedies before filing suit as applying to trustees as well.
 
 
 12
 II. Trustee's Authority to Seek Relief in Federal Court for
 
 Violation of Co-Fiduciary's Duty
 
 13
 The employee benefits funds involved in this case are governed by a comprehensive scheme of federal regulation. Two statutes are especially significant: The Labor Management Relations Act (LMRA), 29 U.S.C. Sec. 186(c), and the Employee Retirement Income Security Act (ERISA), 29 U.S.C. Sec. 1001 et seq. Section 302(c)(5) of the LMRA authorizes the creation of trust funds to provide benefits to employees. 29 U.S.C. Sec. 186(c)(5). As the Supreme Court has noted, Congress' primary reason for "cast[ing] employee benefit plans in traditional trust form [in section 302(c)(5) was] precisely because fiduciary standards long established in equity would best protect employee beneficiaries." NLRB v. Amax Coal Co., 453 U.S. 322, 332, 101 S.Ct. 2789, 2795, 69 L.Ed.2d 672 (1981). Trust Funds were to have an equal number of union and employer trustees and were to constitute a neutral entity designed to serve the interests of those beneficiaries exclusively.
 
 
 14
 In 1974, Congress adopted a detailed code governing the operations of employee trust funds. Pub.L. No. 93-406, 88 Stat. 829 (1974). In addition to instituting requirements for the operation and administration of employee benefit funds, "ERISA essentially codified the strict fiduciary standards that a Sec. 302(c)(5) trustee must meet." Amax Coal, 453 U.S. at 332, 101 S.Ct. at 2795.
 
 
 15
 Fujikawa alleges that the employer trustees' failure to sign benefit checks during the strike was motivated by their desire to use their power as trustees as an economic weapon for the employers and had the effect of strengthening the multiemployer association's bargaining position. The denial of benefits--either in cash or in kind--to striking workers certainly weakens the ability of a union and its members to withstand prolonged economic conflict. The change in the practices of the funds ordered by the employer trustees following commencement of the strike raises a substantial question whether their actions were taken in order to improve PECA's bargaining position. Cf. Siles v. ILGWU National Retirement Fund, 783 F.2d 923, 929 (9th Cir.1986) ("If the trustees of an employee pension plan adopt a rule that prevents a disproportionate number of employees from receiving benefits, the burden shifts to the trustees to show a reasonable purpose for the exclusion."); 29 U.S.C. Sec. 1103(c)(1).
 
 
 16
 The district court ruled that Fujikawa was required to exhaust administrative remedies before filing suit. The various trust instruments establish internal mechanisms by which the beneficiaries of a plan may challenge certain actions taken by the trustees. Counsel for the employer trustees conceded at oral argument that the provision governing challenges to individual eligibility determinations does not apply to Fujikawa. However, the employer trustees argue that Fujikawa was required to submit the dispute to an arbitrator or umpire by the "deadlock provision" of the trust agreement and of section 302(c)(5). The statute and the trust agreement provide that where the Trustees deadlock over the administration of the fund, an umpire must resolve the dispute.
 
 
 17
 Fujikawa contends that the deadlock provision is not applicable and he is entitled to bring this action in federal court without first exhausting any internal administrative procedures because he seeks to enforce specific statutory requirements intended to protect beneficiaries.[1] Amax Coal, 453 U.S. at 332, 101 S.Ct. at 2795; 29 U.S.C. Secs. 1104 & 1109. He points out that because Congress established the minimum standard of care appropriate for ERISA fiduciaries, and intended their fiduciary duties to be mandatory, the standards of care and loyalty are fixed by law and are not subject to modification. 29 U.S.C. Sec. 1110(a).
 
 
 18
 In Amaro v. Continental Can Co., 724 F.2d 747 (9th Cir.1984), we held that exhaustion of contractual grievance mechanisms was not a prerequisite to the filing of suit to enforce section 510 of ERISA, 29 U.S.C. Sec. 1140.[2] Because we were "faced solely with an alleged violation of a protection afforded by ERISA," we ruled that exhaustion was not required. Id. at 751. Cf. Gibson v. Local 40, Supercargoes and Checkers of the Int'l Longshoremen's Union, 543 F.2d 1259, 1266 n. 14 (9th Cir.1976) (exhaustion of administrative procedures established by collective bargaining agreement is not a "precondition" to filing a Title VII action in federal court). The fundamental premise of Amaro is that plaintiffs suing for violation of an ERISA statutory provision, like plaintiffs in Title VII and FLSA actions, have a direct right to sue in federal court, without regard to any contractual agreement to arbitrate the dispute. See, e.g., Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981).
 
 
 19
 The employer trustees assert that in this case section 302(c)(5) of the LMRA is applicable, and therefore that its requirement of exhaustion controls. Although Amaro did not decide the precise question before us, we believe its principles are controlling here. Exhaustion of internal dispute procedures is not required where the issue is whether a violation of the terms or provisions of the statute has occurred. The Amaro rule is equally applicable whether the dispute procedure is established by contract or by virtue of the requirements of the LMRA.
 
 
 20
 Section 302(c)(5) provides that where the employer trustees and union trustees reach a deadlock on "the administration of such fund," the dispute must be submitted to an "umpire" to resolve.[3] 29 U.S.C. Sec. 186(c)(5); see also Hawkins v. Bennet, 704 F.2d 1157, 1160 (9th Cir.1983) (defining deadlock). As the Supreme Court has observed, "a trustee deadlock over eligibility matters, like any other deadlock, must be submitted to the compulsory resolution procedure established by Sec. 302(c)(5)." Amax Coal, 453 U.S. at 338, 101 S.Ct. at 2798.
 
 
 21
 In general, the phrase the "administration of such fund" refers to the operation of the funds under the trust instrument. Our decision in Amato v. Bernhard, 618 F.2d at 559, involved just such an issue. In that case we required the prior exhaustion of internal procedures in an action for "a declaration of the parties' rights and duties" under the pension plan. Amato, 618 F.2d at 561. Section 503 of ERISA requires plans to provide for internal proceedings and we noted that the court would be benefited in determining Amato's claim by the "pension plan trustees interpreting their plans." Id. at 568. Other examples of disputes over the "administration of such fund" come readily to mind. For instance, questions about increasing benefits are ordinarily properly viewed as arising under the trust agreement, and not ERISA. We note that the Second Circuit has held that the "deadlock" language in the statute is applicable with respect to all issues that the trustees have authority to decide by virtue of the terms and provisions of the trust instruments. See Mahoney v. Fisher, 277 F.2d 5 (2d Cir.1960); Barret v. Miller, 276 F.2d 429 (2d Cir.1960). Under this interpretation of section 302(c)(5), it is clear that disputes over statutory duties are not included.
 
 
 22
 Additionally, even under what we have characterized as the "broad interpretation" of the statutory language, Hawkins, 704 F.2d at 1160, Fujikawa would not have been required to submit the dispute to an umpire prior to filing his action. We have summarized the broad view as follows: "the only dispute for which an arbitrator could not be appointed is one in which the trustees attempted to exceed their powers under the trust." Id. (citing Barrett v. Miller, 276 F.2d at 429). Even under this standard, it is clear that Fujikawa's action would be proper because he alleges in essence that the employer trustees were serving as representatives of the PECA and their individual businesses. No trustee has the authority to step wholly outside of his fiduciary role and cease acting with undivided loyalty to the plan's beneficiaries. When he does so, he clearly exceeds his powers.
 
 
 23
 Here, Fujikawa sought immediate relief for the alleged refusal of his co-trustees to perform their fiduciary duties. The requirement of submission to an umpire is not controlling under such circumstances. Fujikawa is authorized by statute to bring the present action; in fact, had he not done so, he might have been deemed to have violated his fiduciary obligations.[4]
 
 
 24
 Accordingly, the district court erred in ruling that Fujikawa was required to exhaust internal remedies. Its grant of summary judgment in favor of the employer trustees must be reversed.
 
 
 25
 III. Discretionary Submission of the Dispute by the District
 
 Court to an Arbitrator
 
 26
 In Amaro, 724 F.2d 747, we suggested that the district court could stay its proceedings in favor of arbitration. Nothing in ERISA or section 302(c)(5) precludes the district court from staying its proceedings in this case so that an umpire may consider the dispute first.
 
 
 27
 In Amaro, we outlined some of the procedural factors to be considered in staying an ERISA action. Although in that case arbitration proceedings had already been instituted; the principles are equally applicable here. We noted:
 
 
 28
 The stay should be premised upon: (1) "receipt of satisfactory assurances that the arbitration is proceeding with diligence and efficiency," ... and (2) a determination that the relief available under [the relevant statutory provision] will not be jeopardized by the stay. In some cases it may be necessary to grant immediately an injunction or other equitable relief, available under [ERISA] to avoid irreparable harm to a party.
 
 
 29
 724 F.2d at 752 (citation and footnote omitted). Where arbitration has not been instituted prior to the court's decision, a court may grant a stay only upon receiving satisfactory assurance that the proceedings will be instituted "with reasonable promptness." Railroad Commission of Texas v. Pullman, 312 U.S. 496, 512, 61 S.Ct. 643, 646, 85 L.Ed. 971 (1941); see also Louisiana Power & Light Co. v. Thibodaux, 360 U.S. 25, 30-31, 79 S.Ct. 1070, 1073-74, 3 L.Ed.2d 1058 (1958) (where abstention is ordered, the parties should "cooperate in taking prompt and effective steps to secure [alternative adjudication].... [T]he District Court, of course, reserves power to take such steps as may be necessary for the just disposition of the litigation should anything prevent a prompt ... determination.").
 
 
 30
 Where delay would have an adverse impact on the statutory rights sought to be enforced or where strong considerations of public policy militate in favor of speedy judicial resolution, a stay is generally inappropriate. See generally Pike v. Bruce Church, Inc., 397 U.S. 137, 140 n. 3, 90 S.Ct. 844, 846 n. 3, 25 L.Ed.2d 174 (1970); Mengelkoch v. Industrial Welfare Comm'n, 442 F.2d 1119, 1126-27 (9th Cir.1971) (Immediate relief is available where "the federal courts are asked to vindicate a specific Congressional policy ... [and strong policy militates against] leisurely processing of [such] actions."). However, even in such circumstances a stay may be proper if the court simultaneously provides interim relief which adequately protects the plaintiff's interests. Amaro, 724 F.2d at 752; Catrone v. Massachusetts State Racing Comm'n, 535 F.2d 669, 672 (1st Cir.1976) (noting "the propriety of granting preliminary injunctive relief during the period that the district court, retaining jurisdiction, awaits the ... outcome [of the deferred to proceeding]. Catrone is an individual litigant whose livelihood is at stake.").
 
 
 31
 Finally, we note that the court should stay its own proceedings only when doing so would serve some legitimate interest of the parties or the court. Before any such stay is issued, the court should consider whether, under all the facts and circumstances of the case, deferring further judicial action pending the outcome of alternative dispute resolution proceedings appears to be the most appropriate.
 
 
 32
 When Fujikawa first filed his complaint in the district court, the employers and the union were embroiled in a lengthy strike. Fujikawa sought immediate relief for the alleged fiduciary breach and argued that delay would result in imminent and serious harm to the funds' striking beneficiaries. It appears that it would have been appropriate for the court to have considered temporary or preliminary injunctive relief, or perhaps a stay and interim relief. Denial of ERISA pension and welfare benefits to eligible workers should be rectified quickly and expeditiously, especially where those workers are not receiving pay due to a strike, a federally protected activity. 29 U.S.C. Sec. 157.
 
 
 33
 Here, by the time of our remand, almost two years will have passed since Fujikawa filed suit. The strike is long over and, presumably, most if not all benefits have been paid. There is now no immediate crisis, thus, temporary or preliminary relief is not required. Nevertheless, it is important that the parties receive a prompt and definitive resolution of the basic question whether striking workers are entitled to receive benefits under the various trusts involved. Because the parties' current collective bargaining agreement, and undoubtedly succeeding agreements, will from time to time expire and because strikes may from time to time recur, Fujikawa and the beneficiaries whose interests he represents are entitled to a determination whether persons covered by the trust are entitled to receive benefits during strikes.
 
 
 34
 On remand, the district court should consider whether its decision-making process would be aided in any way were it to direct that the dispute be submitted to an umpire and, then, receive a copy of his decision. Although we do not decide that question, we note that the employer trustees' only substantive claim appears to be that striking workers are not "employees" and, therefore, are not eligible for benefits. This argument appears at first impression to be frivolous.[5] Nevertheless it is the district court's role to decide initially how it wishes to proceed with the handling of the litigation, and there may be other factors it will wish to consider as well. There is always the possibility, for example, that requiring the parties to utilize the umpire-procedure will result in a final resolution of the dispute and obviate the need for further court litigation. There are sometimes other advantages to the parties that result from requiring them to pursue or promote dispute resolution process, including therapeutic ones. See United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960) ("The processing of even frivolous claims may have therapeutic values of which those who are not a part of the plant environment may be quite unaware."). In any event, on remand the district court may, in its discretion, refer the matter to an umpire, to reconsider Fujikawa's motion for summary judgment or consider such other appropriate motion as the parties may make.
 
 
 35
 We do not pass on the merits of Fujikawa's countermotion for summary judgment, which he is free to seek reconsideration of in the district court.
 
 IV. Attorneys' Fees
 
 36
 Under 29 U.S.C. Sec. 1132(g)(1), we have "discretion [to] allow a reasonable attorney's fees and costs of action to either party." Unlike most attorney's fees provisions, there is no requirement that a party "prevail" as a prerequisite to obtaining fees. We have previously set forth a number of factors to be considered in making a fee award under the applicable statute: the culpability and good faith of the opposing party; the ability of the party to pay fees; the increased deterrence that would result from the award; whether a number of beneficiaries would benefit from the award of fees; and the relative merits of the parties' positions. See Hummel v. S.E. Rykoff & Co., 634 F.2d 446, 453 (9th Cir.1980). Here, under those standards, Fujikawa is clearly entitled to an award of fees. That his party opponents are his co-trustees is no bar. If Fujikawa perfects his claim for fees in a timely manner, we will fix the amount to be awarded.
 
 
 37
 REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION
 
 
 
 [1]
 We note that Fujikawa has "an affirmative duty to prevent every other trustee of the same fund from breaching fiduciary duties, including the duty to act solely on behalf of the beneficiaries." Amax Coal, 453 U.S. at 333, 101 S.Ct. at 2796; see also 29 U.S.C. Sec. 1105(a)
 
 
 [2]
 Section 510 of ERISA provides:
 It shall be unlawful ... to discharge, fine, suspend, expel, discipline, or discriminate against a participant or a beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under [an employee benefit plan].
 29 U.S.C. Sec. 1140.
 
 
 [3]
 The trust instrument contains language parallel to that of the statute
 
 
 [4]
 Because our authority under ERISA is primarily equitable, we note that, under traditional equity principles, and wholly aside from any statutory source, Fujikawa's suit to enforce fiduciary duties and to request that the court instruct the trustees as to their duties is proper. Where a trustee is under a duty to exercise a power conferred upon him, and fails to do so, "the other trustees are not justified in merely acquiescing in the non-exercise of the power.... In such a case it is their duty to apply to the court for instructions." Restatement 2d, Trusts, Sec. 184, comment c (1959). Where there are co-trustees, each can maintain a suit to compel another trustee to perform his duties or to enjoin him from committing a breach of trust. Id. at Sec. 200, comment e. Here, Fujikawa was required to bring suit according to his duties as a trustee at equity and under ERISA
 While it has been suggested that "[a]ll beneficiaries should be made parties, unless they are otherwise adequately represented" where a trustee seeks instruction, G. Bogert, The Law of Trusts and Trustees, Sec. 559, at 165-6 (1980), Fujikawa's status as a union trustee suing to enforce the employer trustees' duties satisfies any such requirement. Cf. Lewis v. Benedict Coal Corp., 361 U.S. 549, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960) (not all elements of private law third party beneficiary contract doctrine apply to collective bargaining agreements).
 
 
 [5]
 We note that it is an elementary proposition of labor law that striking workers remain "employees." For example, 29 U.S.C. Sec. 152(3) defines "employee" in part as "any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute." There is no indication in any of the trust instruments that the parties' intended to alter this definition. Moreover, we do not pass on the question whether the parties could alter the meaning of "employee" so as to exclude workers engaging in federally protected activities
 In addition, we note that the Funds' counsel was asked to prepare an opinion on the question whether the Funds had an obligation to continue paying benefits to striking workers. His conclusion was as follows:
 On termination of the Labor Agreement, each Trust continues to operate for the purposes for which each Trust was established for a period of time sufficient to wind up the affairs of each Trust. Accordingly, during the period of time in which each Trust is winding up its affairs, the Trustees must use Trust assets to pay benefits as provided in Article III of each Trust and to pay expenses of administration incident thereto.